Good morning. We have in this session one case for argument with a bunch of docket numbers beginning with 25, 15, 55. Atlas Data Privacy v. Weinform. Mr. Berry, whenever you are ready, please proceed. Good morning, Your Honors. May it please the Court. My name is Mike Berry of Ballard Sparr. I represent Thomson Reuters Enterprise and West Publishing, and I have the privilege today to be speaking on behalf of all of the appellants, and I'd like to reserve five minutes for rebuttal. Granted. Thank you. This case addresses whether the current version of New Jersey's Daniels Law is facially unconstitutional. It is not about the importance of protecting public officials' safety. You're not contesting that that is a compelling governmental interest. That is correct, Your Honor. Okay. It is not about the authority of the state to restrict the publication of public servants' addresses in certain circumstances. It is not about the concept of Daniels Law or the various Daniels Laws that have been passed around the country. It is about the specific statute in its current form as enacted by New Jersey and as amended in 2021 and 2023. Those amendments expanded the breadth of the law and removed all of its guardrails. The legislature repealed the mens rea standard, the legislature imposed mandatory damage awards, and it allowed claims to be assigned. There is no legislative record whatsoever for why New Jersey enacted those amendments or why it alone needed to enact this one-of-a-kind regime. It is... Counselor, you try to analogize this case to Daily Mail, Florida Star, but those cases are about matters of public interest. You're not saying that the home address of public servants is categorically or even usually a matter of public interest, are you? To be clear, we believe that strict scrutiny applies here. But we have to... First of all, we have to figure out, are we talking about a matter of public interest because that matters here? Are you saying that in the mine run of cases, the home address of a police officer or a judge is a matter of public interest? We are saying that as a category, addresses and phone numbers are a matter of public interest. Why? Why the specific address and unlisted phone number? As Judge Bartle recognized, addresses and phone numbers are necessary for society to function. They have been publicly available for that reason for centuries. But I'm asking, in terms of Florida Star and that line of cases, which you tried to fit this case into, this is about the role that the information plays in public discussion and discourse. How is it that people need to discuss doxxing, basically, home phone numbers and home addresses? How is that like the discussion of the rape at issue in the Florida Star? How can you say those are the same thing? Florida Star and Daily Mail talk about public concern in a categorical sense. In terms of the discussion, yes. The role they play in public discourse. Explain to me how, set aside the unusual case like Cradlewell, where the question is whether public servant lives within a boundary. Cradlewell construes this law not just to be apparently what city you live in, but your exact home address. If we take that construction, how is the exact home address something that gets used in public discourse and debate? Under the Supreme Court's precedent, in Snyder v. Phelps, under the City of San Diego, the standard that the court has set is not just whether it's used in public debate and newsworthy, but rather whether it's of general interest. The court says of value and concern to the community. As we have said in our papers, addresses, as Judge Bartle recognized, are necessary for a society of function. That's like Dun & Bradstreet. The information in Dun & Bradstreet had value. It was useful for functioning. But you are now saying you can't make a case that this has to be discussed and debated. You are saying it's valuable in the way that the information in Dun & Bradstreet was valuable. But Dun & Bradstreet was a matter of private concern. With that particular speech, categorically, addresses and phone numbers are significant to commerce. They're significant to political action. The same way that the information in Dun & Bradstreet is significant. The public discourse test in Daily Mail and Fordstar is higher. Those cases are inapposite. In Dun & Bradstreet, the speech at issue was not simply addresses. It was a credit report. Okay. And you're not saying credit reports are matters of public concern. Even though they're valuable, the huge sectors of our economy depend on them. But the Supreme Court didn't treat them. How is a home address more a matter of public concern than credit reporting information? The information has been a public record for centuries. A public record does not mean matter of public concern the way Florida Star discussed it. In Florida Star, the court said explicitly that if the government places information into the public record, then it is presumed to be a matter of public interest. And here, that information is so because it's necessary for political advocacy. It's necessary for... What could be helpful is, for instance, addressing content, context, and form, which usually is how we determine something is a matter of public concern. So in Florida Star, the context was a court case, which is already a matter of public concern. Can you address Judge Bevis' point as far as context, context, and form? The context, content, and form analysis is conducted when there is an as-applied challenge. When there is a facial challenge, as in here, the question is categorically is this matter of public concern? There may be certain circumstances where particular people's addresses are not. But as a... That's what we're asking. What is the mind-run of cases? Because this is a facial challenge. That's right. So one example would be for public safety. My client, Thomson Reuters, publishes or makes available a product called Clear that is used by law enforcement, by the Marshal Service here, the U.S. Attorney's Office, prosecutors throughout New Jersey to investigate crimes, to prosecute crimes. There's another of the appellants who provides threat detection services. So they go into the dark web and protect public officials to see whether there are threats without the information that's blocked by Daniel. That's... When I read Florida Star, it's quoting the D.L.E. Mail Principle as truthful information about a matter of public significance. You want to expand public significance, so it's basically any information other people can use, but the way you're formulating it would overrule Dun & Bradstreet. I think there are no boundaries on the principle you are elaborating. Give me a definition that somehow puts Dun & Bradstreet on the private significance line and explains why your stuff doesn't look like Dun & Bradstreet's information. Because in the context of Daniel's law, it prohibits the disclosure under any circumstance to any person for any reason. That's about tailoring. That's not about public significance. Right. As a category, however, addresses and phone numbers are a matter of public concern. You're circular. You're not answering my question. Dun & Bradstreet dealt with a specific circumstance of whether the mens reta that was required under defamation needed to show actual malice in all circumstances. What the court held is when there's a matter of private concern from that communication, there still needed to be a mens reta requirement. It was negligence. But they had a lower one. I thought the matter of public... The mens reta was... The cases that require a mens reta have been... Okay. Mens reta is a separate issue about children. The court in Dun & Bradstreet was not issuing a categorical rule for the speech of a matter of private concern as well. But it does seem that it's more analogous to Dun & Bradstreet than Florida Star or Daily Mail. I think that's what we're trying to understand. Why isn't it just a Dun & Bradstreet type of information that is not a matter of public concern? In Dun & Bradstreet, the information was collected directly from consumers as part of a commercial transaction, which makes it a categorically different kind of speech. Okay. But Florida Star distinguished the two things. It talked about both public concern and lawfully obtained. Okay? Correct. So the method of obtaining is not the same thing here. And of course, if it's lawfully obtained from a public database and it's a matter of public significance, Florida Star kicks in. All right. We're going around in circles about public concern. Let's assume you're wrong and it's a matter of private concern. Your strongest argument is this is content-based. And it seemed for a long time like the Supreme Court, content-based equaled strict scrutiny. But there are a couple of recent cases that cut the other way. Vidal v. Elster says there's this trademarks category. And we'll look at that. Historically, it's been treated differently. Content-based but viewpoint neutral. And then we just had Free Speech Coalition v. Paxton a month ago, where again, the Supreme Court said, yeah, it's content-based. But the way in which you're drawing the lines is, you know, it's still not risking suppressing discourse. And so the court did not apply strict scrutiny. So content-based is a big factor in your favor. But why should we nonetheless apply strict scrutiny even after those precedents? This is not a viewpoint-based law. It's content-based but viewpoint neutral. Why should we still apply strict scrutiny? In Vidal, the court was clear that that was a content-based statute. The reason that it did not apply strict scrutiny was because of the unique history dealing with the use of people's names in selling products. The court showed that those things have historically been compatible with First Amendment protection. And the court was very clear that in that circumstance, it was not even laying down a rule with respect to all content-based trademarks, let alone in the entire First Amendment jurisprudence. Here, the history and tradition is far different. Well, let's talk about history tradition. It seems to me like this is just creating a privacy tort. Well, Warren and Brandeis' privacy tort has been around for more than a century. It's not exactly the same. And maybe the features are different. But you would not suggest that at least, you know, public exposure of embarrassing private facts has been around for more than a century, that that means to get strict scrutiny, or that that tort is unconstitutional, is it? No, it's not a content-based restriction. It's not a content-based restriction. It's based on a feature of the speech that makes it, you know, embarrassing, humiliating, degrading. It's not based on time or place or manner. I mean, at Snyder, that's why they said it was subject to strict scrutiny. So are privacy torts unconstitutional, or are they saved by the fact that they've been around for more than a century? Under a common law, there was information that was deemed to be private. It had to be both actually private and private as a reasonable expectation of privacy. So in the example that you're offering, something that is purely purient that was private that occurs in somebody's bedroom, that is something that is a private fact. Here, we're not dealing with information that is actually private, nor that there's a reasonable expectation of privacy, because it has historically been a matter of public record. Okay, well, New Jersey is now changing the reasonable expectation of what's private. This is an expansion of a traditional privacy tort. But it would be literally unprecedented in U.S. history for the First Amendment to allow the sanctioning of speech that republishes information that the government has made available. If we start to go down that— I'm going to ask you about that, because Snyder, where they're talking about these privacy torts or other privacy tort cases, they always identify it either as a matter of public concern, for Judge Bevis's hypothetical, we're assuming this is a matter of private concern, and certainly Rowan and Frisbee recognize a right of privacy around the home, which they allowed a total ban on picketing in front of a home in Frisbee, and Rowan was an opt-out for mail to the home. So, you know, the arena of privacy torts is very large, but it seems this is aimed at one tradition of that penumbra around the home. And then, if you could also talk about, it seems to—the purpose of the statute seemed aimed—seems to be aimed at combining that possible tradition as well as a tradition of protecting against the chills in government function by government actors, which in Nixon, they said, had been around since the founding, certainly operated differently. But I guess that's where I'm interested. You know, there's the deliberative privilege, the investigative privilege, other types of traditions in trying to avoid the chilling of government actors in fulfilling their roles. Could you speak to, you know, are those pertinent here? If not, why not? If they are, are they limited? I think there's two components to your question. The first deals with the privacy in the home and the Courts-Snyder case, which dealt with intentional infliction of emotional distress. In those cases, they're protecting a physical intrusion into the home. The speech at issue, there were many alternatives for the same speech, and that, in this circumstance, is not at all allowed. So it's a very different circumstance. The Supreme Court in Bartnicki said it would be highly unusual to punish the lawful possessor of—to restrict the lawful possessor of information to disclose that information in order to deter a threat by a third party. So I think it's a different— But in Bartnicki, they also mused if this were—if these were intercepted calls that were not of a public concern, they weren't really sure what level of scrutiny they would apply. And again, we're assuming these are not a public concern. Can you point to—I guess I'm interested in that distinction, if you have anything to say about that tort in the context of not—of like a case or some threat of tradition talking about when things are not matters of public concern. Even when speech is not a matter of public concern, it's subject to strict scrutiny. The Supreme Court has been clear about that in case after case, whether, you know, the Alvarez case, the Animal Crush video case, the Stevens case. That does not take it out of strict scrutiny. And with respect to your question about general chilling and the fear that officials may be under, New Jersey could have enacted a more narrowly tailored statute. They could have followed the model of the federal government. They could have followed the model as Wisconsin, which recently came to mind, which are much more narrowly tailored. As I said at the outset, this is not a question—this case is not about just protecting public officials' safety or whether the government has that authority. It's whether— What you think is the main overbreadth of the method that's being used here? How—what is the main thing that should have been tailored more narrowly? I think there's at least three things. One is with respect to disclosure. The—New Jersey bars any disclosure for any reason without exception, right? It doesn't matter who, where, when, why. It doesn't matter if the information is private. It doesn't matter if the information is governed by federal law that protects privacy. None of that matters. So the definition of disclosure, in fact, includes that the information is merely made available, not even that it's obtained or looked at, that it would be a violation. So that would be thing one. It's the broadest by far of any in the country. Second, the fact that it punishes information that the government itself is making available. And as this court said in Schrader, as this court said in Bowley, as the Supreme Court said time and again, whenever the government makes information available, there's always a more narrowly tailored means to prevent its dissemination. It could That's not being done here. Again, the federal government, Wisconsin, and a number of other states provide those exemptions. The third thing is the combination of the assignment provision, the lack of a mens rea requirement, and the mandatory damage awards. Together, those things have the potential and in fact are chilling speech, even protected speech, because of the— I do note that you're saying it does too much to choke off disclosure, and it does too much in the way of enforcement. So you're taking a position on the trade—on one and three, the first of them—taking a position on the trade-off of it's too effective in serving us. How do we weigh the—how well-tailored something has to be when there's a sacrifice or a trade-off, there's no trade-off. But on one and three, there's a trade-off between how well it's going to stop the spread of this information for bad purposes. So how do you suggest that we weigh that and say the government ought to sacrifice some efficacy here? Because one and three clearly make the law more effective. What they do is stamp out more speech. It's hard to stamp out more speech in a way that serves the protecting public servants, right? So there's a trade-off between efficacy and tailoring, and you're saying they should give up some efficacy in order to allow some more legitimate speech. And I'm just asking, what in the precedence tells us about how we should approach that trade-off of the tailoring area? Two is costless, you're saying, right? I think the government's best response on two is, well, a lot of this information is being given by a level of government, okay? And I'm not sure if the state of New Jersey can tell the counties what to do, or maybe that's outside of their control. But one and three, there's a real trade-off. The Supreme Court has been clear, including just a couple of weeks ago in Pat's case, that under strict scrutiny, the statute is presumed to be unconstitutional and has to curtail as little speech as possible to be effective. Yet it could be more effective in protecting safety. The dissenters in Free Speech Coalition would have said, hey, use content filtering, use other stuff. And the majority's response presumably is, well, kids can get their hands on mobile phones, et cetera. Content filtering is not going to do as much as age verification. Free Speech cuts the other way, where they upheld a restriction that was broader and maybe more burdensome to speech because it served the interests better. So in Pat's case, the court was dealing with the category of speech that held unprotected. Well, as to minors, it was unprotected. As to adults, it's protected. Here, you're dealing with purely protected speech, and the risk that is run is that too much speech is taken out. I want to answer your narrative question, which is unanswerable. That's precisely the issue. It's unanswerable, especially on a facial challenge, which is a problem with bringing it at this stage. No, it's unanswerable because the New Jersey legislature, there is literally no legislative record about why they had to enact these amendments. The statute was enacted after the horrific killing of Daniel Adderall in 2020. In 2021, New Jersey amended the statute with no explanation. It did the same in 2023 with no explanation. If there was a legislative record, which this court has required time and again, the Supreme Court has required time again, then maybe you could say that it would be more effective, but we don't know why New Jersey charted this pattern. All right. So you talked about tradeoffs. We're talking about shilling. I do want to make sure to focus on one other thing. When the Supreme Court has insisted on a mens rea, it is basically there to prevent shilling. That's what the Supreme Court said in Smith. It said it in Ginsburg. It said it in Counterman, because Counterman, is it a joke? Is it a real threat? The mens rea protects against that. Ginsburg, obscenity or not, the mens rea protects against that. This seems like a case in which there's very little gray area about what's an address or what's a phone number. Okay. So it's not like, is it obscene? Is it not obscene? Is it a threat? Is it not a threat? Doesn't that make this distinguishable in terms of how important the mens rea is to protect against shilling? In Counterman, the court was clear, as it has been since Smith and even before that, going back to the 50s, that in order to sanction speech, there has to be a culpability requirement. Okay. Answer my narrower question before you go to the authority. Maybe you don't think it depends just on shilling, but is there ambiguity about what is a home address or what is a home phone number, such that you're going to be a lot of other speech that is constitutionally protected? Yes. Okay. Give me an example of where someone would be genuinely unsure about whether he's speaking on some other matter and that he might get punished for it. There is no way under the statute to tell if a person is covered. There's no way to tell if the address that they're sending is of their residence, and there's no way to tell if the phone number is published. But the mens rea requirement that the court has required over the years says that it always has to be tethered to the harm. And here, even if it were just a notice, there is no tethering to the harm. Again, New Jersey stands alone in this respect. Could I ask you a little bit more about your shilling and mens rea argument here? In your exchange with Judge Beavis, you talked about protected versus unprotected conduct, and I'm just going to call it taxing because both of them come up so much in cases, I kind of don't know what to call it. But it seems like each of the defendants here as a group have their own voluntary opt-out provision. And I'm not gleaning from the brief that your position is when someone opts out, whether it's a covered person or just an everyday citizen, that it's protected conduct to nonetheless disclose their address. I think you'd have to go look at the individual companies to see about the opt-out and what that would apply to. That is kind of part of the difficulty here with such a broad facial challenge. But can you give me a high-level answer just for a company that has a voluntary opt-out, anyone can use it. It doesn't seem that the position here is that nonetheless publishing that is protected, protected speech. If a person who has no relationship with one of the appellants here or any of the dozens of others who are facing... Sounds like a big picture. If somebody makes a request to opt out of information that they themselves did not disclose, so this is different than the VPPA or the data privacy statutes where information is collected from the individual. But if an individual makes a request to any company that just has this information, is obtained from the government, says, I don't want you to have this, and does it through the website interface, they're not granted a cause of action. They can't assign their claim to us. I'm just trying to understand what is chilled and what's not chilled. So when they do that, is your position that nonetheless it's protected speech to nonetheless disclose that information? I mean, I'm not talking about a person, I'm just talking about anyone. If you've lawfully obtained information, then it can be disclosed. The chilling effect here is that people are invoking the statute, saying that I am barring you from disclosing this information in any context whatsoever for any reason, regardless of what I myself are doing, and I can get a thousand bucks for that. So the chilling is for... It chills conduct that you are saying is protected, which is even in the presence of an opt-out, it's still protected speech to disclose that person's address or information. Correct. Okay. Question about mental state. You say there's no mental state in the law, and you're right, there's no mental state term until you get the punitive damages, and it'd be kind of awkward to read one in, but there is the requirement of giving notice in 10 business days. So since your client's been put on notice, could we understand that as a form of negligence per se, that you've been notified, and then you have taken a volitional act of disclosing after that time, isn't that at least negligence, not responding to the notice? Because if you didn't get the notice, or you didn't choose to disclose, then you're not liable. Yes, and exactly that negligence per se standard is one of the reasons that the court in Florida Star said that the application was unconstitutional. It said that there had to be a scienter requirement, and that the analysis had to be made on a case-by-case basis. Merely violating the law is what got the newspaper in trouble. Except there was no notice given to the floor to set aside there was public concern. Like, we're talking about a law here where something first has to be brought to your attention. Hey, I'm warning you, I'm a covered person, this law is going to require you to take it down, right? If I'm not mistaken, the newspaper reporter in that case violated the newspaper's own policies. They were negligent with respect to their own policies, let alone the law. And the court said that that's not sufficient. This negligence per se, merely tripping the wire when we're dealing with speech, is not sufficient. You have to be able to show a scienter requirement that is applicable on a case-by-case basis. This law has none, and as you said, it's beyond awkward to read one in here. There wouldn't be a negligence requirement for getting declaratory injunctive relief, would there? The law wouldn't require that for forward-looking relief. Correct, and that's how the federal system is set up. That is how many of the states choose to act. This law does allow declaratory injunctive relief. It does allow that in addition to the mandatory damage. If you fix what you assert is the mens rea problem, does that fix the problem here? I don't think that this court can fix it. I think that's the cases from the Sixth Circuit, the Eighth Circuit, the Saddiqi Bourne case. I'm not talking about importing negligence. For instance, could the actual and liquidated damages be severed? I noticed the punitive damages have a specific mens rea. You just said the equitable damages don't need a mens rea, so that leaves actual and liquidated damages and costs from what I recall is the law. Can those be severed? I think with this particular statute, the whole civil claim would need to be severed because the vast definition of disclose is what makes it over-inclusive. And in addition, we haven't really talked about it. I'm sorry? The whole cause of action. The whole cause of action because of the fact that the disclosure covers such a broad scope. That's talking about your narrow tailoring, but I'm talking about the chilling. Does it fix the chilling problem? It does not because this is a content-based restriction on speech. The broad definition of disclose chills any protected speech. In addition to that, if the requirement were just the punitive damages was left and it was you have to be willful or reckless, why isn't willfully or recklessly enough of a mens rea requirement under cases like Calderman and Ginsberg? Willful and recklessness may be enough for the mens rea component, but it doesn't solve the narrow tailoring chilling problem that Judge Chung was talking about. I thought mens rea took care of chilling. With respect to Ciencer, but there's two problems with this statute. One is its lack of mens rea requirement. It's strict liability punishment of speech. And the second is that it's a content-based restriction on speech. They can't survive strict scrutiny. It's chilled on both. So if it fails for the lack of a mens rea requirement, the statute should be struck. If it fails for strict scrutiny, the statute should be struck. These are independent reasons. If there were a mens rea requirement, New Jersey went back to the law as it was written in 2020. There's a mens rea requirement in there. If that were put back into place, you still have the other problems with the expansive definition of disclosed, the under-inclusivity of allowing people to recover, even if they themselves are posting the information on social media, as several of the plaintiffs here have done. You still allow those recoveries. And that is still the chilling effect. That is the problem with the narrow tailoring. There are two independent reasons for striking the statute. Can you tell me what is your position as far as what does the mine run case look like here? Or not even the mine run case. Mine run abuses. In the context of facial challenges, we're supposed to look at what are the constitutional applications and the unconstitutional applications, sort of compare them to each other. What is a mine run use of the services of all of the defendants here? In a facial challenge to a statute that is content-based on its face, in its text, where we have a statute that prohibits disclosure by any person, any business, any organization, for any reason, that is a content-based statute. And the Supreme Court has been clear, even in the Moody case, that in the usual First Amendment case, we apply the appropriate level of scrutiny. And as this court explained in Bernie, when there's a facial challenge like this to a content-based restriction, the Supreme Court and this court do not go out and look for every hypothetical to determine what might be an invalid application. But I'm not asking you. You tell me. What is the mine run? The mine run is literally any person in the country could be subject to this statute. So the mine run application on its face applies a content-based restriction on the prohibition of addresses and unpublished phone numbers in every circumstance whatsoever. And so as this court said in Bernie, as the Supreme Court said in Bonta just a few years before the Moody case. But on the internet, it doesn't do any work as far as limiting? This is not limited to just on the internet. It prohibits mailing. It prohibits posting. It prohibits exhibiting. This isn't just posting on the internet. That's another way New Jersey could have been more narrowly tailored as a number of states have done. So you read the or otherwise available to expand it beyond the internet? On the face of the statute, in the definition of disclosure. On the internet, or otherwise available? Yes. And you read that to mean anything outside of the internet? Yes. The statute itself, I think, makes that clear. Thank you. We'll have you back in a little while. May it please the court. My name is David Boyce, and I represent the plaintiff here. I want to begin by emphasizing what the court has talked about and what my colleague has, which is this is a facial challenge. And just last year in Moody against Net Choice, the Supreme Court, and there were a number of opinions, but each one of those opinions emphasizes how disfavored facial challenges are in constitutional cases. Justice Alito, in his concurrence, says that a facial challenge means that the challenger has to establish that the statute, quote, can't be applied to anyone at any time under any circumstances without violating the Constitution. Such challenges are strongly disfavored. And they're disfavored for the exact reason that counsel had the difficulty answering some of the court's questions, which is that there are the vast majority of cases here. There is absolutely no issue of public interest or public concern with respect to this information. You don't dispute that this is a content-based restriction. Well, Your Honor, I think the question of whether this is a content-based restriction or not is complicated because what the court has said is that the content-based restrictions are those that relate to a topic or an idea that affects the message that is being described. Now, I think there are applications where this can be content-based. It's normally content-based. I mean, Reed v. Town and Gilbert made content-based very broad. If it's not time, it's not place, it's not manner, it's not on versus off premises. It's based on whether you're communicating an address or a phone number of a covered person, right? You can communicate all kinds of other information. You can communicate addresses of other people. It's these particular people. That's content-based. And content-based traditionally gets strict scrutiny. The reason I say I think it may be complicated, Your Honor, is, for example, in the Supreme Court case in Sereno, which involved the Vermont statute. The question there was whether the prescriber identified information was speech or not. And the court said, we don't have to reach that issue because what the state of Vermont has done here is they have disfavored particular speakers. Everybody can talk about this except for one particular class of people. So the fact that the Supreme Court left that open in Sereno, I think, means that there is some issue as to whether something that is as non-message related as somebody's home address is really content. How do you square that with Vidal that said just the use of a name means that it's content-based? I'm sorry, Your Honor? How do you square that with Vidal where it called that content-based when it was just usage of a name? Now, in Vidal, what the court holds there, of course, is that even though it's content-based, it's viewpoint-neutral. Right. But it did say it was content-based. They did say the name was content-based. So why isn't this content-based? Because I think, I mean, for example, in the context of that case, the name was Trump. And the trademark was too small. And I think in that context, there was no doubt that the name in that applied challenge was content-based. But whether a name in an individual case, in a facial challenge, whether every name would be content-based, I think is a different question. But my point is that even if it is content-based, it is, as Vidal held and as the Tenth Circuit held in the Vote America case that we signed, it is viewpoint-neutral. And if you have something that is viewpoint-neutral, I don't think there is an application for the application of what they refer to as strict scrutiny. Now, of course, as the court pointed out in the Schrader case, I mean, there are two different tests. You have the Daily Mail Florida Star test, and you have the content-based strict scrutiny test. They suggest that you have to meet both of those tests. There's no court that has ever held that. And if that was the case, you would see the court opinions very different because they'd have to analyze both of those tests. But let's assume we're talking about strict scrutiny here. We've gotten a concession that it was a compelling governmental interest. But let's talk about tailoring. Your friend on the other side argues forcefully that this applies to everyone who's covered for every reason. And even if it's some friend telling you an address, why is it that this law shouldn't carve out more exceptions? Or how clear is it that people are going to know what's covered, what isn't? They say, we don't even know what an unlisted phone number is anymore now that there are phone books. So what do you say about the breadth of this law, especially these most recent revisions that your friend pointed out with some force? There's no mens rea. It's automatic. It covers all of these people and doesn't have a bunch of exceptions. First, there has to be notice. And so people are going to know whether they're violating or not. What kind of notice was provided by ATLAS? For instance, was it just a name and said, hey, I'm covered, remove me? Do they actually provide the address and the unpublished phone number? What kind of notice is given? Your Honor, I don't know that that is in the record. The allegations seem to be that ATLAS just sent 19,000 names saying, I am a covered person and I ask you to remove me without saying what your office is, without providing verification that you are a cop or Child Protective Services or a judge. I mean, what if ATLAS gets, what if we inform gets bombarded with a whole bunch of takedown requests? Doesn't it need more than 10 business days to figure out is this legitimate or not? First of all, Your Honor, I would, I think it's important here in respect to that question to keep in mind the procedural context of this case. This is a motion to dismiss and it is a facial challenge. So the assertions of what might happen under certain circumstances, first of all, are not appropriate in the motion to dismiss stage. And second, I think that is exactly why the court in Moody said facial challenges are strongly disfavored in these constitutional cases because they made a tactical decision here to bring a facial challenge. And they made that because they knew that if they tried to come up with the as-applied challenges, it wouldn't protect what they're doing. So there are, when you make a tactical decision, like they made in Moody and they made here, they're stuck with it. And as the majority opinion says- Weren't they directed to raise this challenge at the motion to dismiss stage, which, as you pointed out in your brief, is an odd fit for the inquiry we have to do, where we have to weigh the constitutional applications versus the unconstitutional applications of the law. So given the district court's reasonable efforts to streamline the processes here, why shouldn't they be given another opportunity to get discovery on constitutional versus unconstitutional applications? Well, I mean, first of all, I think they have to raise that in the context of a facial challenge. If this were an as-applied challenge, I think the discovery issue would be quite different. But remember- Even in the facial challenge, right? I mean, we- This is a facial challenge. We know that we have to see if the unconstitutional applications substantially outweigh the constitutional applications. But what the court, both the majority opinion and the concurrent opinions in Moody say, that's the problem of the challenger. What the challenger has to do, in Justice Alito's words, they've got to demonstrate this can't be applied to anyone, any time, under any circumstances. That's a little different from the weighing that we get from the net choice kind of line of cases. So you're saying, in First Amendment cases, generally speaking, don't we have to look at constitutional applications versus unconstitutional applications and weigh them? I think that if the facial challenger presents the court with those, the court can weigh those. And remember, even if you weigh it, in Justice Kagan's opinion, she says it's got to substant- The unconstitutional has got to substantially outweigh the legitimate applications. Here, they can't give you any illegitimate – look at the record in the briefs. What are the illegitimate applications they're asking you to weigh? They are not able to come up with those in any meaningful sense. So – and as the court, I'm sure, aware, the Supreme Court of New Jersey recently did take up an as-applied challenge. And that case held that even though that was a situation where it was a matter of public concern, in that particular case, the statute was narrowly tailored to accomplish a legitimate objection. Well, what if we just – I mean, given the dearth of a record here and the lack of discovery, what if we just look at the mens rea, the lack of a mens rea requirement? Why doesn't that make this unconstitutional? I think there are two things, Your Honor. First, as the district court held – and it's obviously – this is a matter for appellate review – but the district court held that New Jersey would have a fault standard, that they would read a fault standard into the statute. Well, they had the opportunity to do that just a couple of weeks ago, and they didn't. But it wasn't relevant in that case because the way that the court decided it was based on the narrow tailoring. So I respectfully suggest that New Jersey, like most jurisdictions, will interpret a law in a way that makes it constitutional. Well, if we were to disagree with that and if we think that this is strict liability, should we strike it down as unconstitutional? Even if you were to conclude – I don't think you could conclude, Your Honor, that it's strict liability in the face of the fact that it has to be a notice requirement. But we know that notice has to be given, right? But we don't know that – what if someone is on vacation and doesn't receive the notice? And they receive the notice on the 11th day. The information is still posted on the internet. Aren't they still liable under the statute? Well, again, I remind the court that this is a facial challenge, okay? But on the face of the statute, there is no mens rea requirement for deliquidated damages. On the face of the statute, there's no mens rea requirement. However, on the face of the statute, there is a notice requirement. And I think the courts wouldn't normally interpret notice meaning there's got to be adequate notice. It has to be sent and received. And therefore, someone is negligent if they don't comply within 10 days. I think that would be true, Your Honor. I also think that – and again, I don't want to beat this horse too much, but what you're talking about is a very narrow set of cases, narrow set of potential cases where that happens. And this is not a situation in which there is an – as applied challenge, somebody comes in and says, I didn't get notice or I was on vacation or the dog ate the notice. This is a situation in which they, because they're making a facial challenge, they've got to – they bear the burden of establishing that the run-of-the-mind cases are going to have this problem. And that's obviously not true. But let's just go with Judge Freeman's assumption that it is strict liability as to actual or liquidated damages and the fees provision. Can those just be severed and then this is constitutional? Yes, Your Honor. For example, in the Dun & Bradstreet case, I think it's page 763 of the court's opinion, the court holds that you can have presumed and punitive damages if you – if it matters not a matter of public concern. And this is a situation in which I think under the court's precedence, both the Third Circuit and the Supreme Court, this is not a matter of – not a matter of public concern. Well, setting aside whether it's a matter of public concern or not, and what exactly could be severed? I mean, even if you take away the liquidated damages, it seems that there's still – the court shall award actual damages, so maybe it's $5 and it's not $1,000, plus reasonable attorney's fees and litigation costs. So even if we take away the liquidated damages piece, don't we still have a problem with this strict liability? I think there is a distinction between strict liability and the imposition of the penalties. I think you don't have strict liability for two reasons, because of the notice and because of the way the New Jersey courts would interpret the statute as the district court in this case did. I think that even if you viewed it as not having a fault element, it's still a matter of – not a matter of public concern. Because it's not a matter of public concern, you don't get to the next step as to whether it's narrowly tailored or not. Okay. I just want to ask a couple questions about your view of the scope of this statute. If one of the defendants in these cases received notice and responded and said, you know, the nature of my online database is such that my programmers need 30 days to program – to write the code necessary to take these names down, would they be liable under the statute or not? If they made an applied challenge that said it's impossible for us to do it for certain circumstances and they were able to prove that, I think that could be a successful applied challenge to the statute. That would be a statutory defense to liability, isn't it? I think it would be a potential applied challenge to the constitutionality of the statute if they're requiring somebody to do something that they can prove it's impossible for them to do. Okay. All right. Let's see. I think that's good for now. What about your position as far as or otherwise make available those words in the statute? Or otherwise make available. What does that mean? Is it just the internet? Otherwise make available on the internet? Or to your colleague's point, is it mailing any type of availability? I think it is any reasonable kind of availability. Again, we are – it is complicated because this is a facial challenge. Sure. If this were an applied challenge where that was relevant, there would be a number of things that we might investigate. As a matter of statutory interpretation, what does it cover? I think from a statutory interpretation standpoint, it's a reasonable availability. Not foreclosed to the internet? Not. The only other two things I'd like to just keep in mind is they say that this is publicly available, as the Supreme Court has said in the Department of Justice against Reporters Committee case. It makes a big difference whether you're talking about something that's available by going out and searching or whether it's an online database. The court there said it was plainly a vast difference in that situation. Now, that was interpreting a FOIA, but the point is that it is related to the question as to whether having something that's publicly available in land records is really comparable to something that is online. Actually, one more question about the scope of the statute. So this covers news media, including newspapers, and many newspapers have past editions available online. So I see there's an exception in here for previously printed physical copies of a newspaper. Newspapers don't have to recall those if they've already been printed during the notice period. But do newspapers also have 10 days to remove any past references to a covered person's address or phone number that might be in all of their online archives? I think that that's a question that I hadn't really thought about, Your Honor, to be honest. I think that in an applied challenge, that is something we'd have to look at. I come back again that that's not relevant to this case, which is a facial challenge. But arguably, if we were to be weighing the constitutional versus unconstitutional applications, might we consider archival coverage by newspapers on one side of the scale? I think, as I think about the issue, the archival internet probably is not covered by the statute. But that is one that I think in an as applied challenge, we'd have to look at. Thank you. Good morning, Your Honors. Michael Zuckerman from the Office of the New Jersey Attorney General. May it please the Court, much has already been said this morning, so I'll dive right into the topics that I think are of most interest to the Court. Let me just start very briefly with some of the points that were brought up by Judge Bevis's colloquies. I think it's 100% correct that the fact that this is a facial challenge has got to some of Judge Chung's colloquies as well, is really important for understanding what is the mine run application. And we would submit that the mine run application here of this law, at least as we understand it on this facial motion to dismiss posture, is a data broker that is monetizing data, selling or providing tranches of names, addresses, phone numbers, kind of ones and zeros with no added expressive value beyond that. So, far away from the Florida Star Daily Mail type line of cases that receives notice and has eminent technological tools at its disposal to be able to comply within 10 business days or two weeks. That is, in fact, by nature of being a data broker, uniquely able to tell who is the person coming to them, what is this person, you know, what do I have on this person? In fact, I suspect if they renew this at summary judgment, Judge Freeman, that we'll learn that they know much more about us than we probably even want to know. So, I imagine they know quite a bit about myself, my daughter, everybody. I don't think it's actually likely to come out that they have trouble in the mine run case, figuring out if a person is a covered person or not. There is this issue, they get 19,000 of these things. They submit boilerplate, I am a covered person. I'm entitled to a little bit of verification. Is this, in fact, a cop or someone just wants his information down, et cetera? Can we expect them to do 19,000 of these in 10 business days over the Christmas break? So, Your Honor, two answers to that. I mean, first is just I don't think that gets the station of validity of the statute. That sounds like some sort of fact-specific dispute between the parties about these specific requests, not a reason to strike down a statute. But second, I do think two points on the kind of technology, and again, a record at summary judgment might show more about this. My understanding is they do, in the main, have very simple tools for automating this, and that, in fact, big data knows really well how to do this very, very quickly. Leave aside the rare case where it's a mom-and-pop shop and they need 11 days. Again, I want to talk about mens rea because I want to talk about what I think would kick in in that kind of rare hypothetical. But to the earlier colloquy, it naturally tells you everything you need to know about why that can't drive the bus here. I also just want to note, Judge Venus, that I think on the 19,000, there are other laws that require them to take down other people's addresses too. I don't think it's quite, I don't want to oversell this and suggest it's an Article III redressability problem because the laws are a little bit different, but the New Jersey Data Privacy Law already requires them to basically take down information if anybody asks. So it's not as if there's a circumstance where someone says, hey, I'm in New Jersey, and please take down my information, and they say, oh, geez, well, I'm not sure that this person is a cop or not, or I'm not sure they live with a cop, so maybe I can ignore it. I mean, they shouldn't be ignoring it anyway. The regimes are slightly different. Again, we're not saying it's quite a redressability problem, but it does get to the tailoring, it does get to the asserted burden they claim to be facing, which in fact, especially on the spatial posture, I think has to be understood to be quite, quite low. Judge Venus, I also just want to agree that I think the history of privacy torts are really important here. I do think this is in the main Dun & Bradstreet case and not a Smith v. Daily Mail or Florida Star case. I think Vidal, Paxton, I'll add Davenport v. Washington Education Association to the mix there as cases where the Supreme Court tells you pretty clearly that we think about how we apply strict scrutiny with some common sense and some historically inflected understanding. And it doesn't require founding era history. It doesn't need to be pre-ratification history. Again, Paxton just looked to New York v. Ginsburg, Ginsburg v. New York, which is a 1968 precedent as tradition. Vidal looked to the Lanham Act from 1946. Can I ask you about that? In Vidal, there was no majority on what level of scrutiny applied. In Paxton, there is. And in Vidal, the phrase used over and over was history and tradition. In Paxton, it says history, tradition, and precedent. What does that difference mean, if anything, here? So at the finer points of First Amendment theory, Judge Chung, I'm not sure. I think here, it reflects in part the fact that the text of the First Amendment may not tell us very much in this case, of course, because the text of the First Amendment is broad. I do think, and I'd have to reread Vidal. I actually thought that Justice Thomas did have five votes for intermediate scrutiny in Vidal, but I apologize if I'm misremembering that. There was disagreement on- He is where he did scrutiny, and that's where he did not have a majority, if I recall correctly. I'd have to go back to it, but I do- There was disagreement, certainly, in Vidal on how you do the historical analysis to determine that this is not the kind of situation where you should be applying strict scrutiny, but it seems to me there were a number- There were well more than five votes in Vidal for the idea that you don't just automatically do strict scrutiny. Even if you think something is formally content-based, you do look at whether there is some realistic possibility that suppression of ideas is afoot. This was this very narrow context in Vidal. You can't do trademarks without looking at content. How do you then expand that? It sounds like you're saying, well, privacy torts, all privacy torts. You can't, therefore, don't get strict scrutiny because privacy is important historically. Judge Freeman, I do think that's- I think I agree with some of that, actually, because I do think the nature of privacy torts tells you that they occupy unique constitutional space because they, like trademark, like- I'd also commend to the court Judge Hart's opinion for the Tenth Circuit in Vote America versus Schwab. It's about voting, about pre-filled mail-in ballots. Again, there's circumstances where you have to look at content a little bit, and we can debate whether formalistically this is content-based or not, but even if you just assume it is for sake of argument, it's the kind of content-based analysis that is inherent in all sorts of speech-related torts- defamation, intentional infliction of emotional distress in Snyder, all of the privacy torts. You really can't do that analysis without thinking a little bit about content and the idea that you then have to run strict scrutiny on any time a state codifies any kind of privacy tort like that. I think that way madness lies. I don't think it's true to the precedent or the history. Again, this particular law, you know, has one purpose. We have other laws like this. Lots of states have privacy laws for victims of domestic violence, for victims of sex trafficking. This law, if you talk about privacy torts, especially ones that are about the home and the sanctity of the home, they're really aimed at the actual intruder into the home. This is one step removed. This is aimed at the person who's facilitating a possible intruder. So does history and tradition and precedent support that? Judge Chung, I think it does because I think it's the New Jersey legislature, like other legislative bodies, updating that sort of old wine, putting it in new bottles for evolving problems. So it was true that in, you know, Martin versus Struthers in whatever the 40s, in Rowan in, I forget if that's the 60s or the 70s, you could kind of say no solicitation or please take me off your mailing list. The evildoers or would-be evildoers that this law is responding to, of course, do not respond to no solicitation signs. You can't, of course, put up a sign that just says please don't come terrorize my family, please don't come assault my family. So preventing them from figuring out where you live, where you are most vulnerable, where you don't have metal detectors and the marshals, you know, at, you know, around the clock is, I think, the best way. It's a fully narrowly tailored way as the New Jersey Supreme Court held in Craddoville, which certainly would also urge you not to split with them on that. So I think here it is doing that work just for modern problems. You said you were going to get to mens rea, and my colleagues had some pointed questions about this. Your friend on the other side, you know, points out that ordinarily we expect a mens rea in these laws. And Mr. Boies' main response is, well, but you got notice here, that's enough. What were you going to add to that discussion? Yeah, I think I have a few different, a slightly different take. Let me go through a few different points on the mens rea. I mean, I do want to start, Judge Bevis, with the point you raised, which is that mens rea is usually a prophylactic tool. That's what counterman makes crystal clear. We put it in there because we don't want people steering too wide of the zone of restriction. And so in true threats, it's really important because, you know, you don't know if it's a joke or a threat. Here, notice does a lot of work, and so the legislature would have reasonably understood that by saying you have two full weeks, 10 business days to comply, you must get valid written notice. And being kind of cognizant of the state of technology in this space, they actually increased it. It used to be 72 hours under the older scheme that I think my friend, Mr. Berry, suggested was better. It's now 10 days. So that's one way in which it's actually better for his clients. I think they could understand that that would, in most cases, mean you're not going to have real world applications where the person wasn't at least negligent because they've been given all of this notice. This is not a situation like Florida Star where the government itself put the information in the press room, the newspaper publishes, and then all of a sudden gets hit with a torch suit, and it doesn't know what it's doing. They also are getting notice that doesn't include any kind of verification that the person making the request is actually a covered person. They're just getting a bald assertion that this person is a covered person, take it down, and then they're being told that they must comply within 10 business days. So I think that's righteous treatment. I think that's a natural part of all of these kinds of privacy-based laws where you give someone an opportunity. It's true of any citizen, even if they're not a covered person. They don't have to give you more... Does the statute require the government to provide some kind of a certification that someone was covered? It's never required the government to provide some kind of a certification. You've always been able to go in kind of pari-materia, you could go both to the government and to the private entities and say, please take down my information. I think what my friend Mr. Berry wants is that you have to go to the government, you go through the government process as long as that takes, then you get some sort of seal of approval from the government that you can then take to all 80 to 800 data brokers, and then they're going to respect it. I think I have two basic problems with that. One, if you know you're about to be assigned to investigating a dangerous gang that you think is trying to intimidate law enforcement, you may not want to wait to have to do a two-step process. You might want to be able to cover the waterfront at once rather than this kind of two-step. Second of all, if that certification validation that you get from the government has more of your own data on it, it's quite perverse to say, oh, give these data brokers your social security number so you can prove to them you are who you say you are. Third, they have tools available to themselves that they can use to figure out if you are the person that you say you are anyway. Fourth, it's very hard to figure out what the real world example of someone who's fraudulently going to them and saying, please take down my information on behalf of someone else. It's an odd form of kind of entrepreneurialism. I mean, they're just mostly going to take it down, and then what did you accomplish? If their theory is that they're going to be unethical lawyers running out making claims, again, they'll lose those claims if it's a false person and the lawyers are going to be gambling with their bar license, so that seems really unlikely. And then fifth, I think that... But what if it's there are 400 Michael Zuckermans in my database? I guess I'm just going to take them all down because I got this notice. So again, we made this point in the district court as well, and I think, Judge Chung, in that kind of as-applied circumstance where there is someone who has a very, very common name, multiple John Smiths, the data broker could, of course, go back to that John Smith and say, we're so sorry, we're having trouble figuring this out. We've got a number of John Smiths. Does the law require notice of what is the covered address and what is the covered phone number? So if you go to the complaint, there is a redacted... There is an example sample notice attached, and they do... You're supposed to say what you want taken down. So my understanding is they do normally say what the information is. Now, of course, their hypothetical is, well, someone could just lie and say, they're a covered person X who lives at 123 Main Street, but they're not really that covered person. I just think that seems unlikely. And then if it ever did happen, they'll lose that case. If there is a case where it's still ambiguous, there's two John Smiths and they both live at 123 Main Street, then I think maybe that sounds like an as-applied challenge or some unique circumstance. We were talking a little while ago about chilling speech and how chilling has to do with ambiguity and speakers not knowing whether they're covered. Isn't it quite possible that a defendant would get an email out of nowhere saying, I'm a covered person. My name is John Smith. My phone number is such and such. And for the recipient of that notice to not know if they need to take that down and be chilled from expressing whatever they were going to express, whether it's a data broker or a journalist or something, be chilled because they think they might be covered by this law. There's some uncertainty there. Well, Judge Freeman, again, I think that gets back to the fact that there's a separate law that they're not challenging, the New Jersey Data Privacy Law, which they actually say they like. They think that would be a better model. That also independently requires them to take down information. So it's not as if they get these. This is what I'm trying to get at with the idea that it's actually quite hypothetical that there's going to be a circumstance where they get a request from a person and they think, oh, maybe this is someone whose information I don't need to take down, whose information I don't want to keep disclosing. I don't disagree, Judge Freeman. Again, in Craddoville, we conceded there would be, we suspected, as-applied situations where a journalist said, I really want to say that so-and-so lives at 123 Main Street because 123 Main Street is part of this shady land deal, and I can't tell my news story unless I point out the exact parcel that the land deal was about. That's conceivable. It's just very much the stuff of case-by-case adjudication. All right, so your appellate's counsel argues with some force that cases like four of us are in Daily Mail say, look, if the government is disclosing this stuff, then the less restrictive means is government stop disclosing it. Now, Mr. Boies' response was, I think he cited DOJ versus Reporters Committee of Freedmen's Press. There's a big difference between saying a whole bunch of paper land records versus making this available online. Help us to understand, in terms of addresses and unlisted phone numbers, what it is that New Jersey, the state, and what it is that the counties put out there in electronic form that's already searchable, and what is it that's coming from paper records that the data brokers are getting? Because I want to understand whether this is a qualitative shift that is being made by the data brokers. Sure, Judge Vivas. So let me try to answer that at least a medium level of generality, and then we can certainly get into the weeds of the statute, because there is a sort of reticulated scheme for making sure the title system can still work, making sure that elections can still happen. But basically, on that, the kind of already government already providing the information, I think I want to make, you know, two points. One is you got to understand the structure of Daniel's Law, which is that it devolves autonomy onto the covered persons and says, you know, we're going to give you the right to go out to someone and say, hey, please don't disclose my information anymore. So that's why you don't really have to worry, Judge Chung, about the hypos where someone's friend is afraid to share their address. As long as you haven't said to your friend, hey, please don't tell anyone where I live because I'm investigating MS-13 and I'm afraid they're trying to harm my family, your friend's not going to be worried about it because they have no notice. Now, the state provides a kind of a single stop on this. You can go to the Office of Information Privacy and say, please redact my information. At that point, you have to make some sort of affirmations or understandings that you understand that you're relinquishing or burdening some of your separate civil rights and civic opportunities by virtue of making that request. If you do that, you go through that system. They then communicate that out to, and it's sort of a waterfall of information across from the state down to the, you know, regions, counties, municipalities. What are the main government sources of information? Is it DMV records, voter rolls, and property records? I think, again, on a summary judgment record, we can have more evidence of where. But I would suspect it's deeds. I think it's probably county-based deed searches. But the county-based deeds, are those normally searchable by owner's name or just by address or lot or something like that? Many of them are searchable. I haven't logged onto all 21 counties. Many of them are searchable by name, but you can redact them. So a covered person can, through this process, have their name redacted from their mortgage, for example. There is this one very, very narrow carve-out that I don't even think my friends on the other side really dispute or try to claim suggests some kind of overbreadth. And why do you say mortgages can be redacted? Because it just says encumbrances. Yeah, it's sort of a... I mean, I saw the reference that you made to the other law in another section that simply lists mortgages in a different line. But that doesn't mean it's not an encumbrance under Daniel's law, does it? I mean, so Judge Chung, I don't think any party is actually disputing that it is only a carve-out for non-mortgage liens. But still, to answer the question, because of course, theoretically, we could all be wrong about that, we read the cross-reference. You kind of... It's a complicated statute, so I would also commend to the court, I think it's pages 8 to 10 of the Atlas brief, and I think they do this again in the 40s, I want to say 42 to 46, of their brief. They go through it in more depth. They'll probably do it more justice than I can do it from the podium right now. But it is this cross-reference in 47.1b.3 to other than as provided in sub-paragraphs D and E of paragraph 4 of the subsection, which then sends you and tells you that it wants records of liens and assessment lists to be treated differently. There's this thin cross... I think I'm getting this right. Again, this is dangerous to try to do from the podium. The cross-reference to, I think it's to 46.26a.2, that then does the listing separately, does, as we read it, suggest that what the legislature thinks it's doing is treating those other encumbrances as what it means when it says encumbrances, because otherwise it makes no sense in 47.1b.3 to be requiring in-person or to be requiring special authorized individuals, like title agents, to have some special right to get your unredacted address. Why would you not... If that was unredacted to everybody, why would you be giving a special right to the title agents to be able to get it? It's probably the simplest way to say the inference. For the few remaining... Let's say you're right, there's a limited number of things that can be disclosed by the government. Does the carve-out in the section regarding internet disclosures that says, if you've obtained it from the government and disclose it consistent with government guide rails, then this doesn't apply to you? Will that cover all government disclosures of someone who opts out of the government? I'm sorry, Jen, just to make sure I understand the question. If someone is given a... Had received notice from... If I've opted out with the government and then someone else gets... And I've also opted out with a death broker or a real estate broker. And the real estate broker gets property records pursuant to one of the carve-outs and discloses it consistently with the guide rails of that, does that fully cover all government disclosures? There's a carve-out here in Daniel's Law that says, if you obtain information in subsections 47.1b-1 through 47.1b-3 and do it consistently with those sections, you're not covered. However, if you do it inconsistently, you are covered by publicly available unredacted information if I opt out with the government. I don't know that E would cover... I'm not sure that that subsection E would cover someone who did not receive the information unredacted pursuant to one of those exceptions. I think in your hypo, the real estate agent would be receiving it unredacted pursuant to those exceptions. So they would be covered by E. E would be the safe harbor for them. There's a separate reason that someone, even if the real estate broker weren't saved by E, I think the real estate broker would probably still be saved by the fact that they hadn't independently been asked not to share the covered person's information by the covered person. So if you had a third party from the real estate agent's office who then found the information and just in total good faith, sent out a housewarming party notice for the person, they wouldn't have violated anything because they hadn't been asked not to share the information by the covered person. Now, if they sent out that housewarming party invitation and the covered person says, oh, I'm so sorry, please delete that from e-vite or paperless post immediately, because I'm really trying to keep my address private. Then I think, assuming that E wouldn't apply to that kind of third party, maybe you'd have some as-applied argument, are they in privity with the real estate agent? But assuming they're not covered by E, then they would probably have to take it down. But I think that's just consistent with a well-tailored law. And finally, what is your statutory interpretation of or otherwise make available? Yeah, I do think Judge Chang does go to things outside of the internet. I think it requires some sort of external sharing. So I don't think it covers keeping things on an internal database that your employees nevertheless continue to have access to. But I do think it means that someone who wants to obtain this kind of information can't end-run the statute by asking for it by mail. I mean, again, we have people who use lots of different methods to try to obtain this information. I mean, the man who murdered Judge Salza's son was an attorney. It wouldn't have been as tailored a statute if he could have just gone to one of these data brokers that sell the judge's address for $1.95 and said, well, just mail it to me because then you'll be out of the internet and you'll be safe. So we do think it covers things beyond the internet, but that doesn't make it any – that's not overpress. That's, to Judge Bibas's earlier point, that's accurately and adequately protecting the actual interests of the statute. I think that's also true of the kind of claim assignment, sort of claim aggregation possibilities, and it just one more thing if I could, and of course, I haven't answered any of the questions that the court has on mens rea. If you are not persuaded by what I've said about mens rea, I just want to make two other points. This is a state law question, so Judge Bartle's guess was an eerie guess. We think it was right. The New Jersey Supreme Court in Craddoville had no occasion to talk about the precise floor of negligence because it was purpose in Craddoville. Mr. Craddoville wanted to publish Director Caputo's home address. He said that, so there was no reason to talk about what would happen if he just accidentally published Mr. Caputo's address despite having received notice. I do think the statutory text and structure are strong here. We do import sort of backdrop scienter requirements all the time, even when the legislature doesn't make our lives easy and write the exact word in it. Hansen, which we primarily cite as an overbred case from the U.S. Supreme Court in 2023, does this for aiding and abetting. It's totally normal to do that old soil importation, and here you're importing a negligent disclosure tort. You're just codifying in a statute, so it makes total sense it would take that old soil. It also makes sense that you wouldn't derogate from the common law and create this new species of strict liability, a very rare type of liability in New Jersey tort law without a clear statement. That's Marshall versus Klobanov, which they cite, ATLAS cites in their brief. I mean, ordinarily that might make sense, but since this is a new version that eliminated an explicit mens rea, maybe that is not so far field. Well, I think it's just statutory silence. I guess, Judge Young, I don't believe they eliminated a form of mens rea that was less, frankly, covered less because it served the interest not as well because it required you to be negligent as to the precise harm to the person. So if you went to the data broker and said, please take down my information, they said, oh, well, I don't really know if your life is that dangerous or not. That would, I guess, be a defense in that situation, and the legislature, I think, quite reasonably assumed or decided that's not good enough. People should have a right to control their own data, you know, even if the data broker isn't aware of the inner facts of their life and what the exact source of the risk is, especially given that this is already low-value speech. The final thing I'll just say, though, if you have any doubts, Judge Freeman, about the precise, you know, mens rea that you think the New Jersey Supreme Court would apply, I do think that Cradiville's discussion about it not being a trap for the unwary and it being a strict notice requirement is probative, and I would urge you not to split with them on the fact that this is least restrictive means available, but if you have doubts, I would commend to the court Judge Freeman's separate opinion in Zanatech versus Walmart, which is it's a state law question. Certification is always available to have them answer. If you think, if there wouldn't be some negligence defense at the end of the day where some data broker could show, look, I needed 11 days and I'm being held liable even though it was quite reasonable for me to not do this in the first 10, I think the New Jersey Supreme Court would say they can raise that negligence defense despite the statutory silence, but if you have any doubts, I think Judge Bartels' eerie guess was right and you could certify it to the New Jersey Supreme Court and they could give a definitive answer of whether, of how to read the statute. Thank you. Thank you. Mr. Berry, I think you reserved five minutes for a moment. Thank you, Your Honor. I'd like to address four points and then answer any questions that you all have as well. First, the last point that Mr. Zuckerman was discussing, I'd like to discuss the privacy questions that came up, the disclosure questions that Judge Chung has been asking each of us, and the facial challenge point last. With respect to this last question about certification, this isn't a state law question. This is a First Amendment question and the courts in both the Sixth Circuit and the Eighth Circuit in the cases that we cited in our papers, the city of Dearborn case and the Video Software Association case struck the statutes because they were violative of the First Amendment. They created strict liability regimes. The New Jersey Supreme Court has already spoken to this precise situation in the Pomianak case where there was no provision for mens rea in one of the subsections and said that one could not be transplanted in. In the Goldenhagen case and others that are cited in the Atlas papers, the court did just the analysis I believe Judge Chung was talking about where there was a change in the mens rea requirement for dog bite situations where the owners had been at common law, there was a requirement of mens rea. The legislature formally changed that to that is the New Jersey court has already answered this, but it's a First Amendment issue reserved for this court. Second, with respect to privacy, there were a number of comments made by both Mr. Boies and Mr. Zuckerman about privacy. Privacy laws are not exempt from strict scrutiny. There is literally no court has held that a privacy law is exempt when it is content-based. In Schrader, this court said that strict scrutiny applied to what was a privacy statute because it was content-based. The Ninth Circuit and IMDB hold explicitly that privacy statutes are not exempt from strict scrutiny, and if this court were to hold otherwise, it would be splitting from the Ninth. Here, I think it's difficult to term this statute a privacy statute because privacy is not actually required here. There are a bunch of questions about what the government's requirements are, but those requirements only kick in if a cover person makes a redaction request, and there is no requirement under the statute for the cover person to do so to be able to then suppress speech by private actors. That's one of the narrow tailing problems. As a result, even if somebody does make a request, there is no remedy that a person has to add to the government if they fail to comply, and here the information is available even on the internet. Several of the plaintiffs, as we've shown in our papers, their information is available through county records. If a person doesn't, and themselves take stuff... I think Mr. Zuckerman made the point that people can take it down from the county records through this process, but it's still out there from having previously been on the internet, so isn't this the least restrictive means of dealing with that problem? No. Someone wasn't a cop, he becomes a cop, he says, now I've got this dangerous assignment, I want to take it down, so he gets the government to stop disclosing it. What's he supposed to do? The law does not require the cop to take that step, and that is the issue. A cop can say the government can continue to publish this stuff freely, but I still am going to go after these 200 different entities... Because it's not required. Okay. It's not required, and that's the narrow tailing problem, and that's why this statute is not... Why does that matter if this is about a person controlling how their own information is disclosed? To the point that's been made by some of your colleagues, maybe on some of these counties you can just get it very easily. Let's say this person lives in a county where you have to go through a lot of hoops to get it, and they have a lot of property. Go with me on the hypo. Okay. And so, as someone who's controlling their information, and it's their own chill that is being addressed, meaning their own chill in doing their job, they have decided that risk is minimal, this risk is very great. Why is that a problem? In Rowan, the person opted out, and the Supreme Court ruled that the person who is controlling their own information is a threat to their own privacy. So, if someone wants to control what they view as the risk of chill to their own conduct, why can't they do that? I think there's multiple answers to your question.  First, with respect to Rowan in these cases, again, it's intrusions into the home. It's actually providing information into the home where there are other avenues of speech. That is not the case here. Second, with respect to controlling the information, that is not what New Jersey said was the compelling interest. The compelling interest here is safety and security. The controlling your own information, it comes up in these cases where the government itself has the information, and whether the government can disclose it. It is very different than when the information is out there publicly among other people. And that's what sets this apart from things like HIPAA or the Video Privacy Protection Act. Somebody is giving information over to someone to hold that information is a very different situation than addresses and phone numbers, which has historically been public. Third, with respect to the control in general, again, if somebody makes a decision to say, I'm going to not have the government redact my information, and it can put it up there with impunity, that doesn't really address a privacy point. That just gives them a means to sue other people for using the exact same speech that they've allowed from the government, which is not narrowly tailored under any circumstances, regardless of what the interest is. And what about both, well, I guess in Vidal, it's more like dicta, but also in Paxton, it explicitly says, in trademark, there can be room for innovation. In Vidal, it says, the internet from the Reno days, very different than the internet today, and people are allowed to innovate. Can you address that point as far as this maybe being more necessary in the new age, to your colleague's point? As I started with some time ago at the beginning of the argument here, our point is not that the government can't ever restrict the publication of public officials' addresses. That's not our position at all. The position is whether New Jersey's statute, what they have done, and what they have done alone, whether that runs afoul of the First Amendment. Other states, the federal government, have dealt with this in very different ways. We're not saying that New Jersey is powerless. We're saying that they exerted a power that exceeds what is constitutional limits under the First Amendment. I'd like to just, if I could, address the two other points that I said. The first is, with respect to disclosure, Judge Cheney asked each of us this multiple times, and I just wanted to return to it. As I think Mr. Zuckerman just conceded, it doesn't mean just publish on the internet. But again, even if it means just on the internet, it is broader than simply saying it can't be publicly posted on the internet. It's any disclosure whatsoever. So again, returning to Thomson and the clear product, it is an electronic product that, when your honor was in the U.S. Attorney's Office, is made available over the internet. That information would be forwarded by this. One of the appellants here provides address information to the New Jersey legislature so that the legislators can communicate with their constituents. They do that by the internet. The way that information is exchanged today is via the internet. Mr. Zuckerman relatedly said, well, the minority of these cases deal with data brokers. But that is not the target of what this statute is about. It includes any person, any business, any organization, which again is vastly different than what the federal government has done, what other states have done. Moreover, in a content-based restriction, the question is not who is restricted, but what is restricted. And the statute is very clear about what is restricted here is based solely on the content. And Mr. Zuckerman went on at length about the technology available to my client, Thomson Reuters, the large companies that are here. But the people who have been sued include sole proprietorships. There's appellants who are before you who are nonprofit organizations. The issue here is that information can be disclosed by the government to a real estate broker, but some sole proprietorship who receives the notice cannot borrow the payment. I do want to allow you to make your last point on the facial challenge, but you should wrap up. I apologize. I apologize. Yes. On the facial challenge, there seems to be a lot of questions that are tied to the Moody decision. Moody did not overrule the Supreme Court's decision in Reed. It did not overrule Brown. It did not overrule Claiborne. In the context of a facial challenge to a content-based restriction on speech, the law is unconstitutional in all of its applications. In Moody, the situation was very different because the text of the statute applied to both First Amendment protected activity like moderating news feeds, but it also could apply to other activities where it was built on email, transmitting direct messages. Following Moody, courts around the country continue to apply strict scrutiny to content-based challenges when the statute as a whole, like this one, restricts speech, period. Ex Corp versus Bonson in the Ninth Circuit, the Reyes case in the District of Utah, the Alexander case up in the Southern District of New York. Here, the restriction on speech occurs in every circumstance, applies to all people, all businesses, all organizations, in all circumstances with no exceptions. It is a content-based restriction that fails strict scrutiny and should be struck as unconstitutional. Thank you. We thank counsel all around for their excellent briefing and oral arguments. We'll take them out under advisement. I'd ask both parties to work together, prepare a transcript and split the cost. We will go off the record briefly and we'd like to greet arguing counsel, Mr. Berry, Mr. Boies, Mr. Suckerman at sidebar to thank you for coming here and then we'll go back on the record briefly for another.